## Case No. 16,725.

### UNITED STATES ex rel. WHEELER v. WILLIAMSON.

[12 Leg. Int. 198, 199; [1] 3 Am. Law Reg. 729; 3 Liv. Law Mag. 595; 5 Pa. Law J. Rep. 365; 1 Quart. Law J. 70.]

District Court, E. D. Pennsylvania. July 27, 1855.

HABEAS CORPUS PROCEEDINGS—FUGITIVE SLAVES.

[On habeas corpus proceedings to obtain slaves who have been abducted from relator, one to whom the writ is addressed, and who both organized and supervised the abduction, is in contempt if his return merely denies that he had control at any time over the movements of the slaves. or that he knows their whereabouts; this being in effect false and evasive.]

[2] [On the 18th day of July last, the Hon. John H. Wheeler, U. S. minister to Nicaragua, made application to the United States court for this district for a writ of habeas corpus, to be directed to one Passmore Williamson. The petition of Mr. Wheeler, verified by affidavit, was presented by his counsel, Mr. J. C. Vandyke, district attorney of the United States. The court allowed the writ, which was made returnable forthwith, and a hearing appointed for the following day, (the 19th) at three o'clock in the afternoon. On the 19th, no return being made, and it appearing that the party to whom it was directed was absent from the city, Mr. Wheeler's counsel applied for an alias writ, which was allowed, and made returnable on the following morning at 10 o'clock. On the following morning, Williamson appeared in court, attended by his counsel, Messrs. Hopper, Gilpin and Birney, and the following return was drawn up in the presence of the court:

["To the Hon. John K. Kane, the Judge Within Named. Passmore Williamson, the defendant in the within writ mentioned, for return thereto, respectfully submits, that the within named Jane, Daniel and Isaiah, or by whatever names they may be called, nor either of them, are not now, nor was at the time of the issuing of the said writ, or the original writ, or at any other time, in the custody, power or possession of, nor confined, nor restrained their liberty by him the said Passmore Williamson. Therefore he cannot have the bodies of the said Jane, Daniel and Isaiah, or either of them, before your honor, as by the within writ he is commanded. P. Williamson.

["The above named Passmore Williamson being duly affirmed, says, that the facts in the above return set forth are true. P. Williamson.

["Affirmed and subscribed before me, this 20th day of July, A. D. 1855. Chas. F. Heazlitt, U. S. Commissioner."

[Mr. Vandyke briefly stated the facts of the case, and asked leave to traverse the return. The facts appear in the testimony

[1] [Reprinted from 12 Leg. Int. 198, 199, by permission.]
[2] [From 3 Am. Law Reg. 729.]

taken before the court. Mr. Hopper, one of the respondent's counsel, desired time to prepare testimony to prove the truth of the return, and asked for a continuance, for that purpose. The court could not agree to a continuance. If the facts were as stated by the counsel for the relator, there had been a cruel outrage of a criminal nature. Mr. Gilpin stated that the respondent wished to stand on the ground of utter negation of the possession of the servants at any time. No objection on the part of the respondent being made to the return being traversed orally, the counsel for the relator entered upon the examination of witnesses.

[John H. Wheeler. sworn: "I am a native of the state of North Carolina, and a citizen thereof. I am the owner of three colored persons, named Jane, Dan and Isaiah, and have been for some time; I hold them to labor under the laws of the state of North Carolina and of my country; I left Washington on Wednesday, the 18th; I was under orders from my government to proceed to the republic of Nicaragua forthwith; I have been the minister for one year, and had returned with a couple of treaties, and was upon my return to take passage from New York, in company with my three servants, whom I was taking to their mistress, who is now in Nicaragua. My wife is a native of Philadelphia, where I married her. I was forced to go to the residence of my father-in-law, Mr. Thomas Sully, to get some articles of Mrs. Wheeler's. I got a trunk from Mr. Sully's house containing these articles, proceeded to the wharf, but found the two o'clock boat gone. I had to wait until five o'clock for the next train. I spent the intervening time at the nearest hotel,—Bloodgood's, at Walnut street wharf. On going on board the boat at a little before five o'clock, I retired with my three servants to the hurricane deck to get out of the noise and bustle; shortly before five o'clock —the last bell had just rung, at five minutes before five—while I was reading the evening papers, an individual, whom I recognize as Mr. Passmore Williamson (looking at the respondent), came up to me and asked if he might speak to my servants. I replied that I could not imagine what business he could have with my servants, and that if he had anything to say I was the proper person to say it to; Mr. Williamson then pushed past me, and asked the woman (Jane) if 'she was a slave, and if she knew she was in a free country,' or something like it, and then, 'if they (the servants) would like to be free;' the woman replied that she knew with whom she was going, where and how she was going; the respondent then took her by the arm, and began to force her away; I interfered and said to Mr. Williamson, 'I wish you would go away.' Two colored fellows who had come up, then seized and held witness, and one of them said, 'if you make any resistance I will cut your

throat.' Do not know the proper names of the negroes who seized and held me; one of them is called Rabbit; by the interference of some gentleman, who seemed to be a traveller, the negroes released me, and I hurried down to the lower deck, and saw Williamson hurrying the woman off; and other colored persons with the boys, who were struggling to get away; went up to Williamson, and asked him what he was going to do with the woman; he answered that his name was Passmore Williamson that he could be found at Seventh and Arch streets, and that he would be responsible for any legal claim he (witness) might have on the slaves. By this time the colored persons with Mr. Williamson had got the servants off the wharf, and turning down the first street above the wharf (Front street) hurried them into a carriage which was standing about a square below Walnut street, in a large open space with large warehouses in it (Dock street); after the negroes had got off the boat, Mr. Williamson walked behind the crowd, and said something in a whisper to a large burly policeman, who was standing near. I spoke to the policeman in a whisper, asking him to observe the people who were committing the outrage, but the policeman refused to have anything to do with the matter, as 'he was not a slave-catcher.'" Cross-examined: "Mr. Williamson walked back with me from the carriage; he offered to write his name down, but I told him I could write it myself; he gave no directions to the driver; it was not a regular coach stand; there were no other carriages near; the people standing about the carriage, and who hurried the servants into it, were colored." Thomas Wallace, sworn: "I am an officer. I saw the occurrence on the avenue, but not on the boat; a crowd was coming down towards Dock street. I thought it was a fight, and went up; saw several negroes forcing along a colored woman, who was holding back with all her strength, and two boys, who were also struggling; they were all crying; four or five black fellows had the boys; they said they were slaves, whom they were taking away; the defendant was following the crowd; saw him do nothing but follow after the negroes; the negroes were pushing the woman and boys along; they all pulled back; I followed to Dock street, and saw the negroes put the woman and boys in a carriage; I knew the negroes; the defendant whispered to me, and said that they were slaves,—they were getting away,—and asked me to protect them; I said that I would have nothing to do with the matter." Robert T. Tumbleston, sworn: "I am a travelling agent between Philadelphia and New York; I was standing on the forward part of the boat, and saw a crowd; I went forward, and saw a colored woman and two boys being forced ashore by some colored men; I know two of the men, Custis and

Ballard, who were very busy; they said the persons they had were slaves; Custis said to Mr. Wheeler, that if he interfered he would cut his throat from ear to ear; Custis had one of the boys in his arms; I followed a short distance, and then returned." William Edwards, sworn: "I take messages to the line and from it; I was on the wharf when this thing occurred; I saw two boys forced away by two colored men; the boy cried, and was struggling very hard to get away from those who held him; there were ten or fifteen negroes in the crowd." Capt. Andrew Heath, sworn: "Am in the employ of the Camden and Amboy Railroad Company; was on board of the boat; saw a negro bringing a small boy down the stairs of the boat; the boy cried murder; there were twelve or fifteen negroes forcing the woman and two boys along in a crowd; the boys and woman kicked and cried to get away from their assailants; they said they wanted to go with their master; I saw the defendant walking along with them."

[Mr. Vandyke rose, after the above testimony had been taken, and after remarking on the evidence and the return which had been made by the respondent, said that he had two motions to make: 1st. He moved for an attachment against the respondent. for contempt in making a false return to the writ. 2d. That he be held to bail in $5,000 to answer the charge of perjury.

[Mr. Gilpin asked whether the court would now hear the respondent on the question of contempt. He was instructed by his client to say, that evidence could be offered which would put a different complexion on the case.

[KANE, District Judge, said he would either hear counsel on the question as it now stands, or he would hear evidence for respondent.

[Mr. Hopper said the motion of the district attorney had taken himself and friends by surprise, and he would ask time for consideration.

[KANE, District Judge, said he understood that the respondent was willing to take the stand and swear that he had further evidence to offer. If the respondent would make oath that he had such evidence in prospect, the court would consider the application for a continuance.

[Passmore Williamson was then affirmed: "After the colored people left Dock street, in the carriage, I saw no more of them; I do not know where they are; have had no control over them, nor have I had any hand in their escape; my whole connection with the affair was this: I had heard that these three persons were in the city, and I felt anxious to inform them of their rights; for this purpose I went to Bloodgood's Hotel, where I saw a yellow boy; I asked him about the matter, and he told me where the party was; when I went upon the upper deck of the boat, I saw that man, (pointing to Mr. Wheeler); I approached the colored

woman, and asked her if she knew her rights, that by law she was free; Mr. W. asked me what I wanted. I told him my errand; he (Mr. W) kept interfering, and said she knew her rights and he did not want any interference with his affairs; Mr. W. reminded her of her children at home, and asked her if she wanted to leave them; she replied that she did not, but that she wanted to be free; Mr. Wheeler insisted that the woman did not want to go; there was an excitement, and the children cried. I saw them taken away; the object was secured of enabling them to act in accordance with their rights." Question by Mr. Vandyke: "Was it your object to take them from Mr. Wheeler? A.: "It was, if they desired." Cross-examined: "William Still, a colored man, first informed me of the matter; he laid upon my desk a note containing the facts; I told him to go to the wharf and attend to it, that I was going out of town; I afterwards altered my mind, and went to the boat; I was there before William Still; I do not know who engaged the carriage; I don't know who had hold of Mr. Wheeler; I told Mr. Wheeler I would be responsible to him for any damage his rights might sustain." Question by Mr. Vandyke: "Did you say his 'rights,' or his 'legal rights?' A.: "I do not recollect which I said. No man has rights that are not legal rights. I told Still to get the names if he could, and if they went to New York, we would telegraph there; he said there was nothing in the way of their remaining here, if they wished; I told him to hurry down to the wharf and see that their wishes were complied with. My first idea was to get out a writ of habeas corpus here, but as there was no judge in town, I thought it best to telegraph; I was afraid that as the boat was about starting, we would not have time to accomplish anything. Still said nothing to interfere; when I went down to the boat, I saw him talking to Mr. Wheeler; he is clerk at the Anti-Slavery office, in North Fifth street. Still was the only person on board I knew. I saw him this morning; we had a conversation respecting this case. We conversed as to the safety of the party; he said they were safe, and that they would not return under any circumstances; he did not tell me where they were. I am secretary of the active committee of the old Pennsylvania Anti-Slavery Society. Mr. Still did not tell me at what time the party returned. I do not know who got into the carriage. I saw it drive off."

[Mr. Vandyke contended that the respondent's testimony was no testimony at all. His statement was not sufficient to contradict the positive evidence of disinterested witnesses. It was apparent that these slaves were within the control of the respondent. The latter, the district attorney contended, had disposed of this property, and that he could reach it, if he felt disposed. The respondent was the ringleader in robbing the owner of his property. He then leaves town, and this morning, early, he has a conference with his companion in crime. Mr. Vandyke went on to argue that the return to the writ was not only an evasion, but an absolute falsehood, and that the parties were under the control of the respondent. He urged, in conclusion, that the respondent had not purged himself of contempt, and that he was liable for it and for perjury. The respondent's counsel, after consultation, determined to leave the matter to the court for decision, without argument.

[KANE, District Judge, said, that the case was of so grave a character, and the consequences so great to the defendant, that he was desirous, before pronouncing an opinion, to take time to consider and examine the matter. In the mean time, the defendant must enter bail in the sum of $5,000, on the motion to hold him for perjury, to appear on next Friday morning for a further hearing, at which time he would deliver an opinion upon the subject. The motion for an attachment for contempt will go over, and be disposed of at the same time.

[The court then adjourned.] [3]

Mr. Vandyke, U. S. Dist. Atty.
E. Hopper and C. Gilpin, for defendant.

KANE, District Judge. Col. John H. Wheeler, of North Carolina, the United States minister to Nicaragua, was on board of a steamboat, at one of the Delaware wharves, on his way from Washington to embark at New York for his post of duty. Three slaves, belonging to him, were sitting at his side on the upper deck. Just as the last signal bell was ringing, Passmore Williamson came up to the party—declared to the slaves that they were free—and forcibly pressing Mr. Wheeler aside, urged them to go ashore. He was followed by some dozen or twenty negroes, who by muscular strength carried the slaves to the adjoining pier; two of the slaves at least, if not all three, struggling to release themselves, and protesting their wish to remain with their master; two of the negro mob, in the meantime, grasping Col. Wheeler by the collar, and threatening to cut his throat if he made any resistance. The slaves were borne along to a hackney-coach that was in waiting, and were conveyed to some place of concealment; Mr. Williamson following and urging forward the mob, and giving his name and address to Col. Wheeler, with the declaration that he held himself responsible towards him for whatever might be his legal rights, but taking no personally active part in the abduction after he had left the deck. I allowed a writ of habeas corpus at the instance of Col. Wheeler, and subsequently an alias; and to this last, Mr. Williamson made

---

[3] [From 3 Am. Law Reg. 729.]

return, that the persons named in the writ, "nor either of them, are not now, nor was at the time of issuing of the writ, or the original writ, or at any other time, in the custody, power or possession of the respondent, nor by him confined or restrained; wherefore he cannot have the bodies," &c. At the hearing I allowed the relator to traverse this return; and several witnesses who were asked by him, testified to the facts as I have recited them. The district attorney, upon this state of facts, moved Mr. Williamson's commitment (1) for contempt in making a false return; (2) to take his trial for perjury. Mr. Williamson then took the stand to purge himself of contempt. He admitted the facts substantially as in proof before; made it plain that he had been an advisor of the project, and given to his confederates sanction throughout. He renewed his denial that he had control at any time over the movements of the slaves, or knew their present whereabouts. Such is the case, as it was before me on the hearing.

I cannot look upon this return otherwise than as illusory—in legal phrase, as evasive, if not false. It sets out that the alleged prisoners are not now, and have not been since the issue of the habeas corpus, in the custody, power or possession of the respondent; and in so far, it uses legally appropriate language for such a return. But it goes further, and by added words, gives an interpretation to that language essentially variant from its legal import. He denies that the prisoners were within his power, custody or possession at any time whatever. Now, the evidence of respectable, uncontradicted witnesses, and the admission of the respondent himself, establish the fact beyond controversy, that the prisoners were at one time within his power and control. He was the person by whose counsel the so-called rescue was devised. He gave the directions, and hastened to the pier to stimulate and supervise their execution. He was the spokesman and first actor after arriving there. Of all the parties to the act of violence, he was the only white man, the only citizen, the only individual having recognized political right, the only person whose social training could certainly interpret either his own duties or the rights of others under the constitution of the land.

It would be futile, and worse, to argue that he who has organized and guided, and headed a mob to effect the abduction and imprisonment of others—he in whose presence and by whose active influence the abduction and imprisonment have been brought about—might excuse himself from responsibility by the assertion that it was not his hand that made the unlawful assault, or that he never acted as the gaoler. He who unites with others to commit a crime shares with them all the legal liabilities that attend on its commission. He chooses his company, and adopts their acts.

This is the retributive law of all concerted crimes; and its argument applies with peculiar force to those cases in which redress and prevention of wrong are sought through the writ of habeas corpus. This, the great remedial process by which liberty is vindicated and restored, tolerates no language in the response which it calls for that can mask a subterfuge. The dearest interests of life, personal safety, domestic peace, social repose, all that man can value, or that is worth living for, are involved in this principle. The institutions of society would lose more than half their value, and courts of justice become impotent for protection, if the writ of habeas corpus could not compel the truth, full, direct, and unequivocal, in answer to its mandate. It will not do to say to the man, whose wife or whose daughter has been abducted: "I did not abduct her; she is not in my possession; I do not detain her, inasmuch as the assault was made by the hand of my subordinates, and I have foreborne to ask where they propose consummating the wrong."

It is clear then, as it seems to me, that in legal acceptance the parties whom this writ called on Mr. Williamson to produce, were at one time within his power and control; and his answer, so far as it relates to his power over them, makes no distinction between that time and the present. I cannot give a different interpretation to his language from that which he has practically given himself, and cannot regard him as denying his power over the prisoners now, when he does not aver that he has lost the power which he formerly had. He has thus refused, or at least he has failed, to answer to the command of the law. He has chosen to decide for himself upon the lawfulness as well as the moral propriety of his act, and to withhold the ascertainment and vindication of the rights of others from that same forum of arbitrament on which all his own rights repose. In a word, he has put himself in contempt of the process of this court and challenges its action. That action can have no alternative form. It is one too clearly defined by ancient and honorable precedent, too indispensable to the administration of social justice and the protection of human right, and too potentially invoked by the special exigency of the case now before the court to excuse even a doubt of my duty or an apology for its immediate performance.

The cause was submitted to me by the learned counsel for the respondent, without argument, and I have, therefore, found myself at some loss to understand the grounds on which, if there be any such, they would claim the discharge of their client. Only one has occurred to me, as perhaps, within his view; and on this I think it right to express my opinion. I will frankly reconsider it, however, if any future aspect of the case shall invite the review. It is this: that the

persons named in this writ as detained by the respondent, were not legally slaves, inasmuch as they were in the territory of Pennsylvania when they were abducted.

Waiving the inquiry, whether for the purposes of this question they were within the territorial jurisdiction of Pennsylvania while passing from one state to another upon the navigable waters of the United States—a point on which my first impressions are adverse to the argument—I have to say: 1. I know of no statute, either of the United States, or of Pennsylvania, or of New Jersey, the only other state that has a qualified jurisdiction over this part of the Delaware, that authorizes the forcible abduction of any person or any thing whatsoever, without claim of property, unless in aid of legal process: 2. That I know of no statute of Pennsylvania, which affects to divest the rights of property of a citizen of North Carolina, acquired and asserted under the laws of that state, because he has found it needful or convenient to pass through the territory of Pennsylvania. 3. That I am not aware that any such statute, if such an one were shown: could be recognized as valid in a court of the United States. 4. That it seems to me altogether unimportant whether they were slaves or not. It would be the mockery of philanthropy to assert, that because men had become free, they might therefore be forcibly abducted.

I have said nothing of the motives by which the respondent has been governed. I have nothing to do with them; they may give him support and comfort before an infinitely high tribunal; I do not impugn them here. Nor do I allude, on the other hand, to those special claims upon our hospitable courtesy, which the diplomatic character of Mr. Wheeler might seem to assert for him. I am doubtful whether the acts of congress give to him, and his retinue, and his property, that protection as a representative of the sovereignty of the United States, which they concede to all sovereignties besides. Whether, under the general law of nations, he could not ask a broader privilege than some judicial precedents might seem to admit, is not necessarily involved in the cause before me. It is enough that I find, as the case stands now, the plain and simple grounds of adjudication, that Mr. Williamson has not returned truthfully and fully to the writ of habeas corpus. He must, therefore, stand committed for a contempt of the legal process of the court.

As to the second motion of the district attorney, that which looks to a committal for perjury, I withhold an expression of opinion in regard to it. It is unnecessary, because Mr. Williamson being under arrest, he may be charged at any time by the grand jury; and I apprehend that there may be doubts whether the affidavits should not be regarded as extrajudicial and voluntary.

KANE, District Judge, said he would give the defendant a full hearing upon any motion his counsel should choose to present.

The court then took a recess.

After the decision by the court, United States Marshal Wynkoop took the prisoner into custody, and conveyed him to Moyamensing prison; in a carriage, and handed him over to the keepers. A number of Williamson's friends requested the marshal to put the prisoner into the custody of one of his deputies, and thus avoid sending him to prison, but the marshal declined, by replying that he would comply strictly with the mandate of the court.

[Subsequently Messrs. Townsend & Read moved for a rule to show cause why the writ of habeas corpus should not be quashed, which application was refused. See Case No. 16,726.]